## CHANDLER v. CLARK.

1. LIMITATION OF ACTIONS — STATUTE — APPLICABILITY — TITLE BASED UPON DECREE.

    A title based upon an administrator's deed executed in obedience to a decree for specific performance granted by the probate court under sections 9472-9486, 3 Comp. Laws, is within the protection of the statute of limitations applicable to titles resting upon judicial proceedings (section 9714, subd. 1, 3 Comp. Laws).

2. JUDGMENTS—PRESUMPTION OF REGULARITY.

    Where, on appeal from a decree quieting a title based upon a decree for specific performance granted by the probate court under sections 9472-9486, 3 Comp. Laws, no attack is made in the briefs upon the formal regularity of the probate proceed-

ings, and such proceedings, though put in evidence, are not printed in the record, it will be presumed that the probate proceedings were regular and authorized the making of the decree.

3. VENDOR AND PURCHASER—BONA FIDE PURCHASERS—QUITCLAIM DEED—SUFFICIENCY.

The grantee in a quitclaim deed cannot claim the rights of a good-faith purchaser as a matter of law.

4. SAME—NOTICE — UNRECORDED DEED — ACTUAL NOTICE — EVIDENCE—SUFFICIENCY.

On a bill to quiet title by the grantee in an unrecorded deed, evidence examined, and *held*, to show that defendants had actual notice that complainant was claiming under an unrecorded deed, proof of which notice they endeavored to avoid while investigating the title before they purchased, and that complainant had such open and notorious possession of the lands as to constitute notice.

5. TAXATION—TAX SALES—TAX TITLES—REDEMPTION—TITLE OF REDEMPTIONER.

A redemption from a tax sale by the holder of an apparently valid title of record, but which was in fact acquired by fraud, merely operates to restore the title to the original owner and cannot be made the basis of a claim of title by the redemptioner.

Appeal from Alpena; Emerick, J. Submitted October 24, 1907. (Docket No. 18.) Decided February 15, 1908.

Bill by Merrit Chandler and others against Lewis E. Clark and others to quiet title to certain land. From a decree for complainants, defendants appeal. Affirmed.

*Charles R. Henry* ( *DeVere Hall*, of counsel), for complainants.

*C. S. Reilley*, for defendants.

BLAIR, J. The bill of complaint in this cause was filed to quiet title in certain timber lands in Presque Isle county and to remove "the cloud on the complainants' interests in said lands created by various deeds from the

heirs of Nicholas Smith to Lewis E. Clark and from Clark and wife to Davis C. Burton and from Burton and wife to Silas M. McTiver and Ella M. McTiver." All of the parties claim through Nicholas Smith, of Elkhart county, Indiana, now deceased, who acquired title to the lands in question, together with lands in Cheboygan and Mackinaw counties, through patents from the State dated December 17, 1880, and recorded December 26, 1892. Complainant Chandler derives his title through a power of attorney from Nicholas Smith to one Andrew Moody, empowering him to sell any lands belonging to Smith in the counties of Mackinaw, Cheboygan, and Presque Isle; a contract for the sale of such lands between Moody and Chandler; and an administrator's deed executed by Moody, as administrator of the estate of Nicholas Smith, deceased, under the order of the probate court for Cheboygan county. The power of attorney was duly executed by Nicholas Smith and Mary A. Smith, his wife, at their residence in Elkhart county, Indiana, February 1, 1889, and was recorded in the office of the register of deeds for Cheboygan county, Michigan, on the 20th day of May, 1889. It was not recorded in Presque Isle county. The instrument contained the following provision:

"Our said attorney shall confer with R. W. Sample, of the city of Lafayette, in the county of Tippecanoe and State of Indiana, and shall procure from said Sample his appraisement of said lands so to be sold, and our said attorney may sell any of said lands at said appraisement, or at and for any greater price, provided the same is a reasonably fair, cash market price for such lands, and our said attorney may make, execute and deliver to the purchaser or purchasers in our name and for us good and sufficient warranty deeds for such lands by him so sold, and our said attorney may receive the payments therefor in trust for us, to be by him first paid for us and applied upon to pay off a certain mortgage by us executed in favor of Ury Hicks," etc.

The articles of agreement for the sale of lands in Cheboygan and Presque Isle counties executed by complain-

ant Chandler and Nicholas and Mary A. Smith, "by A. J. Moody, their attorney in fact," on the 28th day of August, 1889, provided that Chandler should pay for the lands described the sum of $1,700.

"And it is further covenanted by and between the parties aforesaid that if said party of the second part, before paying in full the above amount, should sell any or all of the above lands, or any or all of the timber thereon, then and in such case, said parties of the first part shall make a proper deed to said second party, or his assigns, of the land or timber so sold, conveying to him a perfect title therein, excepting for all back taxes, upon payment to them of the amount of the appraised value of said land or timber so sold, as per appraisement of said property made by Archibald Earl in May, 1889, now in hands of said first parties, and if any timber shall be so sold which has not been appraised, separately from the lands upon which the same may be situate, then the amount paid by said second party to said first parties shall be the appraised value of the land upon which the said timber so sold may be situate."

The administrator's deed, made in pursuance of the order of the probate court for Cheboygan county, was executed on July 15, 1892, by Moody, as administrator, and on July 22, 1892, by Mary A. Smith as widow, "for the purpose of relinquishing her dower interest" and was recorded in Cheboygan county, August 22, 1892. This deed, through inadvertence, was not recorded in Presque Isle county.

The defendants' chain of title is as follows: Nicholas Smith, at the time of his death, January 20, 1892, left surviving him his widow, Mary A.; William C., Judson D. and Herbert Smith, sons; and Mary S. Allen and Stella Huston, daughters. Herbert has since died. October 23, 1901, Melvin E. Huston and his wife, Stella, Mary S. Allen and William C. Smith executed a quitclaim deed, for an expressed consideration of $5, to Lewis E. Clark, describing 360 acres of the Nicholas Smith lands in Presque Isle county. This deed was recorded January 2, 1902. Lewis E. Clark was a son of Mary A.

Smith by a previous marriage.   December 31, 1901, Mary
A. Smith executed a quitclaim deed to Lewis E. Clark,
covering the same lands, which was recorded in Presque
Isle county, January 2, 1902, consideration $1.   January
1, 1902, Lewis E. Clark and Jennie A., his wife, executed
a quitclaim deed to Davis C. Burton for an expressed
consideration of $1,000.   This deed was recorded in
Presque Isle county January 6, 1902.   There were no wit-
nesses to the signatures of this deed.   The deed describes
360 acres in sections 22 and 36, town 34 north, range 2
east.   January 29, 1902, Clark and wife executed a war-
ranty deed of the undivided 5-6 of same lands to Davis
C. Burton for an expressed consideration of $1,000.   This
deed was recorded in Presque Isle county February 4,
1902.   February 27th to March 4, 1902, quitclaim deed
from widow and heirs, except Judson, to Lewis E. Clark
for an expressed consideration of $5, conveying additional
lands, recorded March 17, 1902.   March 8, 1902, Lewis
E. Clark and wife executed a warranty deed to Davis C.
Burton for an expressed consideration of $2,000.   This
deed was recorded January 7, 1903, and conveys 520 acres
in sections 13, 14 and 25, town 34 north, range 2 east.
January, 1903, warranty deed by Burton and wife to
Silas M. McTiver and Ella McTiver, his wife, expressed
consideration $2,000.   Recorded   January   16,   1903.
Conveys 680 acres in sections 22, 25 and 36, town 34
north, range 2 east.   January 14, 1903, mortgage from
Silas McTiver and Ella McTiver to Patrick Mahoney and
Daniel Mahoney, consideration $2,000.   Covers 680 acres
in sections 22, 25 and 36, town 34 north, range 2 east.

"Auditor General to George F. Brown and Mary L.
Farley.   Tax deed for 1897, dated Sept. 4th, 1901, rec.
Mar. 15th, 1902, 3 p. m., lib. 20 of deeds, p. 280, cons. $728.
N ½ of s e ¼ sec 36, t 34 n, r 2 e, subject to the relevant
conditions imposed by Act No. 229, Public Acts of 1897.
"Auditor General to John A. Miller and George F.
Brown.   Tax deed for 1897, dated Sept. 4th, 1901, rec.
Mar. 15, 1902, 3 p. m., lib. 20 of deeds, page 281, cons.
$8.40.   N ½ of s w ¼ sec. 22, and s e ¼ of s w ¼ sec. 22,

town 34 n, r 2 e, subject to relevant conditions imposed by Act No. 229, Public Acts of 1897.

"Auditor General to Geo. F. Brown and Mary L. Farley. Tax deed for 1897, dated Sept. 4th, 1901, rec. Mar. 15th, 1902, 3 p. m., lib. 20 of deeds, p. 278, cons. $10.30. N w ¼ of n e ¼ and s ½ of n e ¼ sec. 36, t 34 n, r 2 e, subject to relevant conditions imposed by Act No. 229 of the Public Acts of 1897.

"Auditor General to John A. Miller and George F. Brown. Tax deed for 1886 and 1897, dated Sept. 4th, 1901, rec. Mar. 15th, 1902, 3 p. m., lib. 20 of deeds, p. 282, cons. $11.35. S w ¼ of n w ¼ sec. 22, t 34 n, r 2 e, subject to the relevant conditions imposed by Act No. 229, Public Acts of 1897.

"George F. Brown and Mary L. Farley to Davis C. Burton. Quitclaim deed, dated Feb. 18th, 1902, rec. Mar. 15th, 1902, 3 p. m., lib. 19 of deeds, p. 538, cons. $80.72. N w ¼ of n e ¼ and s ½ n e ¼ sec. 36; also n ½ of s e ¼ sec. 36, town 34 n, r 2 e. It is also intended hereby to assign and set over to second party, certificates of purchase of said lands Nos., respectively, 31,508 and 31,506, dated Sept. 4th, 1901, for taxes of 1898.

"John A. Miller and Geo. F. Brown to Davis C. Burton. Qc. deed, dated Feb. 21, 1902, rec. Mar. 15th, 1902, 3 p. m., lib. 19 of deeds, p. 539, cons. $102. S w ¼ of n w ¼, n ½ of s w ¼ and s e ¼ of s w ¼ sec. 22, t 34 n, r 2 e. First parties also assign and set over to second party all certificates of purchase of State bids of said lands for taxes of 1898, Nos. 30,603 and 31,446, dated Sept. 4th, 1901.

"Auditor General to Davis C. Burton, as assignee of Geo. F. Brown and Mary L. Farley. Tax deed for 1898, dated Oct. 13, 1902, rec. Dec. 18th, 1902, 1:30 p. m., lib. 23 of deeds, p. 361, cons. $16.13. W ½ of n e ¼ and s e ¼ of n e ¼ and n ½ of s e ¼ sec. 36, t 34 n, r 2 e. Subject to the relevant conditions imposed by Act No. 229, Public Acts of 1897.

"Auditor General to Davis C. Burton, as assignee of J. A. Miller and Geo. F. Brown. Tax deed for 1898, dated Oct. 13, 1902, rec. Dec. 18, 1902, 1:30 p. m., lib. 23 of deeds, page 364, cons. $18.12. S e ¼ of n w ¼, e ½ of s w ¼ and n w ¼ of s w ¼ sec. 22, t 34 n, r 2 e. Subject to the relevant conditions imposed by Act No. 229, Public Acts of 1897."

A system of sectional indexing has been in use in

Presque Isle county since as early as 1892. This sectional index showed the following entries, among others, affecting lands in question in this suit:

"Charles R. Miller and Merrit Chandler to Northern Extract Co. Hemlock bark contract, dated June 7, 1899, rec. Sept. 29, 1899, 9 a. m., lib. 1 of M. R., p. 182, cons. $20,000.

"20,000 cords of hemlock bark, standing timber on s w ¼ of n w ¼, n ½ of s w ¼ and s e ¼ of s w ¼ of sec. 22, e ½ sec. 25, n w ¼ of n e ¼, s ½ of n e ¼ and n ½ of s e ¼ sec. 36, town 34 n, r 2 e, with other lands.

"Merrit Chandler and wife, Rachel H. S., to Lobdell & Bailey Mfg. Co. Warranty deed, dated Sept. 9th, 1901, ack. Sept. 9th, 1901, rec. June 25th, 1902, 1 p. m., lib. 23 of deeds, p. 338, cons. $50,000.

"All standing timber and bark, except the hemlock timber and bark sold to Fletcher Paper Co., the Northern Extract Co. and 20,000,000 feet of elm and basswood now lying, being and growing upon s w ¼ of n w ¼, n ½ of s w ¼ and s e ¼ of s w ¼ of sec. 22, e ½ of sec. 25, n w ¼ of n e ¼, s ½ of n e ¼ and n ½ of s e ¼, sec. 36, t 34 n, r 2 e, with other lands.

"The interest in the timber in this instrument is subject to vendue lien for $93,500 to be paid in 6, 12, 18, 24 and 36 months from August 20, 1901, with interest at 6 per cent., according to notes made by second party to E. J. Lobdell, B. M. Bailey and W. W. Bell, and by them indorsed and delivered to Charles R. Miller, Merrit Chandler, Chas. E. Cheney, and De Forest L. Stratton, as security for payment of said timber of the purchase price thereof.

"Charles R. Miller and Merrit Chandler to Gardner, Peterman & Co., incorporated. Contract, dated May 13, 1899, rec. Aug. 14th, 1899, 3 p. m., liber 1 of M. R., page 170, cons. $50,000.

"20,000,000 feet of elm and basswood timber of certain lands in Presque Isle and Cheboygan counties, described in this contract, but not in this abstract. Miller and Chandler hereby agree, in case there is any shortage of the 20,000,000 feet of elm and basswood timber on said lands described in this contract, and they will make up any deficit on said 20,000,000 feet from other lands owned or that may be hereafter acquired by them. Miller and Chandler bind their heirs as well as themselves."

The case presents three questions:

(1) Did complainant Chandler obtain a valid title to the lands in question?

(2) Was defendant Burton a subsequent purchaser in good faith for a valuable consideration?

(3) Did Burton acquire title by his tax deeds?

1. Andrew J. Moody testified:

"Mr. Archibald Earl made an appraisement of the lands. Mr. Earl was ordered through Mr. Sample to make the appraisal. * * * That appraisal shows the value of the land to run between four and five dollars an acre, to the best of my knowledge. * * * I received the second power of attorney spoken of from Nicholas Smith and Mary C. Smith, his wife. I made the contract with Mr. Chandler under the second power of attorney.

"Q. By the terms of the second power of attorney, under which this contract was made, were you restricted as to prices by the judgment of any other person than yourself?

"A. I was not.

"Q. Was that second power of attorney in writing?

"A. Yes, sir. (Objected to by Mr. Reilley for the reason that the second power of attorney is in writing, and writing is the best evidence.)

"Q. You have said in reply to Mr. Reilley that this second power of attorney was in writing?

"A. Yes, sir.

"Q. Have you a copy?

"A. I do not know whether I can find it or not. I think it is on record in Cheboygan county. I know it is on record in St. Ignace. * * *

"At the time Mr. Earl made that appraisal in May, 1899, I had no second power of attorney. It was somewhere between the middle of June to the first of July, 1889, that I got my second power of attorney. * * * I could not tell when I put the second power of attorney on record. * * * I cannot tell you when the second power of attorney was made and executed. I sold lands under the second power of attorney, without reference to any appraisement whatever. * * * I do not know why I recorded Exhibit D, the power of attorney made February 1st, 1889, when at the time I recorded it I had already informed the parties or decided for myself that I could

not sell the land under power of attorney, for that was the first day I went to Cheboygan. \* \* \* I would swear if it should appear that there is no other power of attorney except the one I have called your attention to, and marked Exhibit D, on record in Cheboygan or St. Ignace, the register neglected to do his duty and deceived me. I do not remember that I ever saw the second power of attorney after leaving it to be recorded. I left it for record, to be forwarded to the next county for register. As I remember it, that is all the instructions I left. That was before I made the contract with Mr. Chandler."

No effort appears to have been made to produce the second power of attorney nor to prove it from the record thereof, nor to show whether it actually was of record. As suggested by counsel, the contract between Moody and Chandler refers to an "appraisement of said property made by Archibald Earl," in terms which are appropriate to the execution of the contract under the first power of attorney and which are inappropriate to and apparently inconsistent with the alleged second power of attorney. It is unnecessary, however, to find upon this record whether a second power of attorney was executed or not, since we are agreed that as against the defendants' objection there was no competent proof of such an instrument.

Complainants contend, however, that, regardless of the terms of the power of attorney, their title under the deed cannot be attacked, for the reason that such attack is prohibited by subdivision first of section 9714, 3 Comp. Laws.

Defendants' counsel insist that the statute affords no protection to complainants because:

(1) The title depends upon the validity of the contract and not upon the validity of the deed, and where the title is such that it is immaterial to the holder whether the probate sale is regular or irregular, the statute has no application, citing *Showers* v. *Robinson,* 43 Mich. 506; *Donovan* v. *Ward,* 100 Mich. 601; *Millar* v. *Babcock,* 29 Mich. 526; *Toll* v. *Wright,* 37 Mich. 93.

(2) The contract of sale was not in pursuance of the power of attorney proved and no valid deed could be based upon it. *Davenport* v. *Parsons*, 10 Mich. 42.

It was held in *Millar* v. *Babcock*, 29 Mich. 526, that where the court had lost jurisdiction of attachment proceedings, through failure of the plaintiff to publish notice in lieu of personal service, as required by the statute, a subsequent sale on execution under the void judgment did not authorize the purchaser to claim the protection of the statute.

The application of the statute was again before the court in *Toll* v. *Wright*, 37 Mich. 93, where it was said:

"The construction of this statute of 1863 has, however, once before been in controversy before us, and we were of opinion that an execution sale made upon a void judgment was not protected by it. *Millar* v. *Babcock*, 29 Mich. 526. The conclusion was derived from the phraseology of the statute, which does not protect sales as such, but sales made under judgments, etc. The case is in point here, and must deprive the plaintiff of the protection of the statute of 1863 if the order on which she relies was void for want of jurisdiction. This is a short and special statute of limitations, and no one can take advantage of its provisions who is not within them. The question here is not whether a void deed might not support an adverse possession, but whether an adverse possession has been had under such deed as that statute indicates. We should be compelled, therefore, before we could apply the statute of 1863 to the case, to find that the sale had been lawfully ordered."

See, also, *Smith* v. *Davidson*, 40 Mich. 632; *McVickar* v. *Filer*, 31 Mich. 304.

There is nothing before us in this record to show that the probate court of Cheboygan county was without jurisdiction to order the sale to Chandler on June 21, 1892. In the absence of proof to that effect, we cannot presume that the court had before it and acted upon the first power of attorney rather than the alleged second power of attorney under which Moody swore in this case he actually made the sale. No attack is made in the briefs upon

the formal regularity of the probate proceedings, and such proceedings, though put in evidence, are not printed in the record. Under such circumstances we must presume that the probate proceedings were regular and in accordance with the provisions of chapter 255 (sections 9472–9486) 3 Comp. Laws, and authorized the making of the decree. We do not think this case falls within the principle of *Showers* v. *Robinson* and *Donovan* v. *Ward,* supra.

Complainants asserted in the third paragraph of their bill of complaint—

"That on, to wit, the 15th day of July, 1892, the said Merrit Chandler, having paid in full the purchase price for all the lands so purchased from said Smith, received a good, ample and sufficient deed in law, from Andrew J. Moody, administrator of the estate of Nicholas Smith, and from Mary A. Smith, widow of said deceased Nicholas Smith, which said deed was duly executed under and by virtue of a decree and order duly made by the probate court for the county of Cheboygan, State of Michigan, therein and thereby vesting in said Merrit Chandler a good and perfect title to all the lands mentioned in the contract, including the lands hereinbefore described."

The petition for specific performance under the provisions of chapter 255 put in issue the right of Mr. Chandler to a title to the lands in question, and "all persons interested in the estate" had a right to "appear before the probate court and defend against such petition." The validity of the title so acquired was in controversy in this suit and the limitation statute applies.

2. It is clear that the widow had notice of Mr. Chandler's title, since she executed the very deed under which he claims title to the lands in question. It is quite improbable that Mrs. Smith should not have informed her son, Clark, who lived with her, of this deed when she turned over to him for attention the letter mailed to her husband after his death by the purchasers of the tax titles. Clark also admits that he talked with Mr. Chandler about the title after receiving the quitclaim deed and before the sale

to Burton. We have no doubt of the correctness of Mr. Chandler's statement as to the substance of the conversation. He testified:

"In October, 1901, Mr. Clark met me on the street and said he wanted to see me; he said he wanted to know how it was that I was selling timber from some lands in sections 25 and 22, that I was selling timber to Lobdell-Bailey and different people. I said, 'The best right anybody could have, that I owned the land.' Well, he said he didn't think I did. * * * I said I got the title through Moody and through Mr. Smith—his wife; he said he would like to see that deed. I told him I didn't think I could show it to him; I didn't think I had it. I said, 'I suppose Miller of Adrian has that deed.' I told him I could show him a contract I had with Moody in regard to it. He asked me to see that; I showed it to him, the next day, I think it was, he called to see it and I showed him the contract."

This is practically admitted by Mr. Clark. Clark testified in part:

"When I came through Flint I saw Brown & Farley, that was in October, 1901, my first trip, and when I left them I did not make any arrangement to redeem the lands. I told them that I would redeem the land. I told them that I expected to redeem them. I had the money with me to pay the costs at that time, although I did not pay any part of it. They showed me some kind of an abstract, a sort of a certificate of title. They told me afterwards it was what they called an abstract, that is where I got the information, just as I give it. In that paper it stated that Mr. Chandler had made a contract with the Northern Extract Company, a contract for the bark. Mr. Chandler told me that he owned all the lands and that he had a deed for them, but when I called on him to show me, he showed me a contract. I don't know as I took it in my hands. I could not say if he advised me who signed. He read the paper to me and it contained these lands. I don't think he informed me that Nicholas Smith signed it. He claimed to have a contract from A. J. Moody, acting under power of attorney from Nicholas Smith. I did not know they were lands described in both counties of Presque Isle and Cheboygan. I told him there was no record in Presque Isle county. * * * I

stopped at Brown & Farley's. * * * I sold these lands to Burton, and my wife and myself signed three deeds; the first dated January 1, 1902, which did not include all the lands. I was to receive on the first deal a thousand dollars for the lands in sections 22 and 36. I owed Burton $200 at the time. He held my note without security. * * * Burton had a house and lot in Elkhart. It was a one-story house. It was on a lot about 8 or 10 rods long and about 2 rods or better wide, as near as I could describe it. The value of that property at that time was $1,000. * * *

"*Q.* Your next deed is dated January 29th, and that is a warranty deed of the same land. How did you come to give that deed on the same land ?

"*A.* Because when I gave him a quitclaim deed, the taxes—I had notices that there was taxes to the amount of about $182, and I couldn't give a warranty deed until the taxes were paid.

"*Q.* Had the taxes been paid in the meantime ?

"*A.* Yes, sir. He was not to assume the taxes. I was to pay the taxes and I paid them. I did not pay any other taxes except those on 22 and 36, and I think the amount was $182. This was paid to Brown & Farley, as they held the certificates. They had served a redemption notice. * * *

"*Q.* But it was simply a redemption of the taxes ?

"*A.* That is as I understood it. * * * The only purpose of the deed of January 29, 1902, was to make a warranty deed instead of a quitclaim, because then the warranty deed could be recorded. * * *

"*Q.* Mr. Clark, when the deed, on the 29th of January, was made, I ask whether or not anything additional was paid. Burton didn't pay you anything on the 29th ?

"*A.* The pay was all made at one time. At the time we made the first deed. * * * There was the mortgage on the house of about $450 and he gave me my notes of $200. We paid these taxes and then I got about $68, but that was all the one time, it was not afterwards. He gave me back my notes. I was to have $1,000 from Mr. Burton. There was a mortgage of $450 on the house, and assuming that I would have to have $450 some place else, but he made that up by discharging my note of about $200 and paying these taxes. We cleared the mortgage and I assumed the mortgage, that is, he made up the $1,000 to me with me assuming the mortgage.

"*Q.* Now, Mr. Clark, your bargain was that you were to have $1,000 for the land?

"*A.* Yes, sir.

"*Q.* And you paid the taxes?

"*A.* And we paid the taxes. He was to have it clear of taxes. * * *

"*Q.* How much were you to get for the descriptions of land in the deed dated March 8, 1902?

"*A.* I was to have $2,000.

"*Q.* How much did he pay you in cash at that time?

"*A.* Not anything.

"*Q.* Has he ever since paid you anything?

"*A.* Not a cent. * * * I was to give the heirs out of this what I could afford, but there was no set price; they merely took my word for it."

Clark and Burton were partners in the meat business, and Burton had been admitted to the bar and had done something in the abstract business. Burton testified as to his purchase from Clark, in substance, as follows:

"I was sick most of the time in the meat business and I wanted to get out; and he told me I had better get out where I could have more exercise. He owned some lands in northern Michigan that he would trade for my property here. I do not think the deal was going on more than a day or so until I took him up on the proposition. He said that they were lands he had bought from the Nicholas Smith heirs, and, as I remember the transaction, he never saw the lands. But I think the same day that this transaction was going on, a brother of one of the regular customers came in the market. I asked him where he was from. He said he had been living in northern Michigan; had been over in Presque Isle county. I told him I was about to make a trade for some property there and he told me anything he thought I could buy in that township would be good property. I told him the lands were in 34 north, range 2 east. He thought the lands ought to be worth $7 to $10 an acre in that township."

After this information, Burton traded with Clark, giving a deed of his house and lot in Elkhart "and some other affairs" for the Presque Isle county lands. Burton drew up the deed of the house and lot to Clark and delivered it to him. This deed was dated January 1, 1902, but

was neither signed, witnessed, nor acknowledged. A building association held a mortgage against the house and lot of $500, upon which the mortgagor was entitled to a credit of $50.    For the purpose of compensating Mr. Clark and reimbursing him for such money as he might pay in the satisfaction of this mortgage, he surrendered to Clark a note of $200 which he held against Clark, paid taxes for Clark on the Presque Isle lands which Clark had agreed to pay, amounting to $182, and paid him the balance of $68 in cash.    On February 21, 1902, Burton and wife executed a warranty deed to Clark of the house and lot, for an expressed consideration of $1,000, "subject to a certain mortgage of $500 in favor of the Equitable Building & Loan Association of Elkhart, Indiana, which mortgage said grantee assumes and agrees to pay."    This deed was dated January 1st but executed and acknowledged February 21st.    It was never recorded.    On October 1, 1902, Burton and wife deeded the house and lot to Charles Batchelor and Mary J. Batchelor "for the sum of eight hundred dollars," containing the same clause as to assuming the mortgage as the deed to Clark.    Mr. Batchelor testified:

"Mr. Clark had a deed but it was not on record, and in order to save those fees he wanted to know if I would take it from Mr. Burton and I did.    *   *   *    I paid Mr. Clark $300 and paid the mortgage also."

Burton further testified, in substance:

"I swore that I drew out a deed and we signed it, and it was delivered to Mr. Clark, but this is not the deed. This was drawn by the notary, John Monschein, on the date on which the acknowledgment was taken, the date of signing it.    I think he copied it off from the deed which I had drawn before, the one I gave Mr. Clark down at the market.    *   *   *    I think Mrs. Burton signed this deed at the time Mr. Monschein drew it.    I can't account for the difference in ink with which the signatures are written and the body of the deed, unless he wrote this with a fountain pen and we signed it with ink from the ink-well.    I do not know why we did not ac-

knowledge the instrument first drawn and given to Mr. Clark, unless it did not suit Mr. Monschein's fancy. I do not remember. * * * The second deed given to me by Mr. Clark for the lands on sections 22 and 36, executed by Mr. and Mrs. Clark on the 29th of January was given to me about three weeks before the acknowledgment of this deed, I think. I do not remember just exactly. Nothing passed from Mr. Clark to me at the time of executing this deed. I do not know why when this deed was drawn February 21st, 1902, that it was dated back to the first day of January, 1902. * * * The date of the quitclaim deed for lands in 22 and 36 was January 1st, 1902; I sent my deed up for record and it was about the 25th or 27th of January, 1902, that I got a registered letter from the sheriff of Presque Isle, notifying me to pay the taxes or redeem it within a certain length of time. I went up to Flint to see the parties who held the tax titles, and I took my deed along with me. I laid down the deed to show that I was Davis Burton. I think it was Mr. Brown, when he looked at the paper he said, 'God! I wish that I had of known that,' and I said, 'What?' and he kind of hesitated on the start about telling me. 'I would never have served this notice on such a deed as that if I had of known it.' He said it did not have any witnesses on, and that was news to me. I never heard of a deed being witnessed before. I asked him what I had better do. He said I should take it back and get another deed, that I did not have any title, for that deed was without witnesses and I came back and got another deed. I do not know as he told me a warranty deed; I think he did, too, but I would not swear positively; I believe he did. I was not in Brown & Farley's over five or ten minutes and returned immediately to Elkhart and procured this warranty deed. Brown & Farley did not tell me in that conversation that a quitclaim deed would not be held good against a prior unrecorded instrument. They did not tell me that it was notice to myself that Clark's title was defective. I think when I came back I told Mr. Clark about the deed not being witnessed, etc., and he gave me a warranty deed. I do not remember asking him for one; I think I did. When I got the quitclaim deed of the description in 22 and 36, I think Clark said he would not give a warranty deed until after the taxes were taken up; something to that effect; he thought he could not with the delinquent taxes at Flint—

the claims of Brown & Farley and their clients. He did not afterwards make any objection to giving a warranty deed. When I came back, he went and got it. I told him the deed was not what it should be and that I wanted another deed if he could get it. I do not know as he asked me what the matter was; I could not tell anything about that; and he went and got me a warranty deed and it was signed.

"The deed I got on March 8th was not recorded. I went up to Rogers City to see what was the matter. Mr. Schmidt told me about the deed and said there was delinquent taxes on it and we got to talking about those lands and I saw something there on the register's book that looked like Gardner, Peterman & Co., and other things, and he told me about a man named Chandler arresting a man and sending him to the penitentiary for cutting timber on some of these lands. From that I went over into the treasurer's office and I found out who had been paying taxes there and I began to smell burnt woolen and it began to look suspicious to me about the title and I brought my deed and came back home, did not record it. * * *

"I made my first visit to Rogers City the latter part of March or first of April. I think it was some time after I had received the abstract which I have introduced in this case and which is marked defendant's Exhibit F. I said to Schmidt the first time I was up there that I was a poor man and had put all I had into this land deal and if I lost it would ruin me. I do not think I examined the abstract procured from Mr. Schmidt within a week after its date, February 11th, 1902, on lands in sections 22 and 36. I might have looked it over. I do not remember reading it. * * *

"Before the deed was finally acknowleged, I made a business trip to Flint.

"I could not tell the language used in the first conversation I had in reference to buying the lands, in 25, 13 and 14, but I remember that he wanted $4 an acre and there was 520 acres; and I told him if he would cut out the $80, I would buy it and I did. I paid him $2,000, that is, I gave him a mortgage for $2,000. It was from myself and wife to Lewis E. Clark on lands on 13, 14, 25, 22 and 36."

Silas McTiver was a member of the board of supervisors of Cheboygan county and the title to his farm in Che-

boygan county, purchased of Chandler, depended on the validity of Chandler's deed from the administrator of the estate of Nicholas Smith. Prior to his purchase from Burton, McTiver went over some of the lands with one Sid Merrill.

"I says to Sid: 'That looks as if somebody had been cutting and lumbering timber in there, stealing or something.' He says: 'I do not think it.' I says, 'You wait here and I will go down and see.' So I got down in there and I found—oh, there was probably five or six acres that looked just like some one had been stealing some timber; they had took the best of it; it was left on the ground; they hadn't moved it. I called Sid down. He came down and I says, 'What does this mean?' I says, 'Did you ever see this before?' He says, 'Why, it looks as if somedody had made a trespass.' I says, 'Here is "L. B." on some of these posts and ties.' I says, 'Ain't that Lobdell-Bailey mark?' He says, 'I believe it is.' * * * I made up my mind that Lobdell-Bailey people would not cut timber on anybody else's lands, knowing it, and that it was simply a trespass. On the road home I asked Sid what price I could buy them lands for. I told him I could give $4,000 or $5,000 for them. He says, 'If I can get you a warranty deed of those lands that is all right and everything is in good shape, for $4,000, will you give me a thousand dollars?' I says, 'Yes, sir, I will do that.' Then, later, on the road, he says, 'There is a mortgage of $2,000 against these lands, held by a man by the name of Lewis E. Clark, of Elkhart, Indiana, and he could sell it to you, subject to the mortgage.' * * * I asked Burton if he could give me a good warranty deed. He, said, 'Yes.' He said he could, that he had all the deeds with him but one. He showed me a whole bunch of papers and I looked them over. Of course, I do not know much about titles—do not pretend to, but I always supposed a warranty deed would hold in spite of anything. I supposed that was a good deed. I did not suppose a man could have a warranty deed unless it was perfect. I looked his papers all over and got to thinking that probably I had better look up a little further—there might be something wrong. Mr. Reilley had always been my attorney in Cheboygan, and I asked him if he could look up the record in Rogers City by telephone, and 'he said, 'Yes.' Afterwards Reilley called me up at the court-

house and told me he had heard from the register of deeds and said that they told him that the title was absolute in Burton, but that there was one tax title held by Chandler and Covey, but that the tax title was not good. He told me I was perfectly safe to close the deal."

McTiver and Daniel Mahoney procured an abstract of the party and called upon Mr. Covey, an attorney at Rogers City:

"As the abstract did not come Monday and our time expired Tuesday, Mr. Mahoney and I decided to drive over to Rogers City to see about the abstract. I had made up my mind to tell Mahoney about the thousand dollars which Merrill was to have in the deal. I told Mahoney, 'We have to pay $2,000 for the deed, subject to the $2,000 mortgage, and to pay Sid Merrill $1,000.' Mahoney says, 'It is all right, I do not care who gets the money. The land is worth it.' We went to the courthouse to get our abstract, and Mahoney asked in whose name the title to the land was, and was told it was in Burton's. We inquired for a good attorney and were told that there were not many attorneys there; but Covey is here, and I remember saying to Mahoney then, 'I don't believe Covey would be good counsel for us on this abstract, if he holds an interest with Chandler and the tax title, it will be natural for him to try and discourage us.' We called on Mr. Covey, and Mr. Mahoney said to him, 'If there was a deed or a tax deed against a piece of land that was not recorded, would it hold previous to the other deeds?' And I think Covey says not, if you didn't have knowledge of that, or something of that kind."

They then submitted the abstract to Mr. Harpster, one of their solicitors in this case, whom they called to Onaway.

"Mr. Harpster took two or three hours to examine it, then he told us the lands rested in Burton. We had to close the deal that night and we went to the bank and took up the deed and paid the money."

Daniel Mahoney, who resided at Onaway, testified:

"We obtained the abstract and I asked the register of
151 MICH.—12.

deeds who the title of those lands was in and he said a man named Burton.

"*Q.* Did you look over the abstract?

"*A.* I didn't. I couldn't tell, if I did. I ain't qualified. If I looked over it, I wouldn't be any better off. I got the abstract to see that the title was a perfect title, an absolute title to those lands. I was going to put money into them and help, too, and I wanted to know. Mr. Harpster, the attorney, was to look over the abstract. * * * At that time I had not heard that Chandler made any claim to the land. I read from the abstract that he had made transfers.

"*Q.* You don't mean to say, Mr. Mahoney, that you and McTiver went over to Rogers City and got this abstract and never looked it through until you got back to Onaway?

"*A.* I do say so, because I know I didn't. No one looked it over before we got back to Onaway. * * * I contemplated taking an interest in these lands, if I found the title absolutely in Burton, that is, I agreed to furnish the money. We have an arrangement in reference to that. * * * It is all the interest I have in these lands, is my interest in the mortgage.

"*Q.* You have got no interest in the timber or the lands, outside of your mortgage, have you?

"*A.* No, sir. My brother owns half the interest, that is, in the mortgage. We have the private contract for the timber. It is Mr. McTiver's timber, and we are to buy it of him for the mill, at a certain price.

"*Q.* What is the price?

"*A.* I do not remember that, the prices. * * * I don't recollect what my talk with Covey was. I asked him a question, if there could be a title, a valid title to the property that was not on record, I think that was the question. * * *

"*Q.* You asked him if there could be a valid title to property that wasn't recorded?

"*A.* Yes.

"*Q.* You was led to make that inquiry because you had heard there was an outstanding deed?

"*A.* No, I didn't hear there was.

"*Q.* Why did you ask that question?

"*A.* Well, because I just merely asked the question.

"*Q.* You didn't know but what there might be?

"*A.* I never heard there was; no. I heard that there

was not any; and if I heard there was one, I never would have put a cent into it. * * * There was memorandum or agreement that after $3,000 is paid we were to have one-third interest, each of us. Memorandum drawn up. I presume that memorandum is at home. I haven't got it with me. * * * I mean by the three, Patrick, myself and McTiver. I consider my value in the land was my money. * * * My brother and I put in $2,000 and borrowed another thousand, the other thousand to be paid out of the land.

"*Q.* Was he to pay it to you in money or in timber?

"*A.* Well, I don't care which way he would pay it.

"*Q.* But what was the agreement?

"*A.* It was to be in money, money consideration. He was to pay 7 per cent. interest, that is my recollection now. I would not be positive whether it is 6 or 7, but I think it is 7. I am quite sure it is 7. No note accompanied the mortgage, that is my recollection, that there is no note. I do not remember when it was to be paid back, two or three years, I think. There was nothing said about paying it back in timber; timber does not come in as pay on that, he is to pay in money. We have a bargain as to the hardwood, elm and basswood, at the market price, with McTiver, just what any one else would pay for it. The real consideration of my going in the deal was that after the $3,000 had been paid, that I would have a third of all that was left, that was the thing that induced me to go in. * * *

" *Q.* Mr. Henry asked you if you had any interest in this transaction except to get your money back, your $3,000, and you say, ' No, sir, that is all I have got in it.'

"*A.* This is the interest I claim; I would not be positive that there is any interest in the profit. My interest— my security is for $3,000. If I get security—get my pay and interest on $3,000 I consider that I am paid. I was cross-examined by Mr. Henry very particularly.

" *Q.* He asked you leading questions, and those leading questions was, if you had any interest in this transaction except to get your money back, the $3,000, and you said, ' No, sir, that is all I had.'

"*A.* Well, I consider that is all the interest I have got. I did not put another interest in it.

" *Q.* Well, you then told Mr. Henry the thing that induced you to go into it.

"*A.* If there is any more, if there is any profit from it;

I am not sure of any profit from it, any more than the interest. If I get my money back, I will be satisfied. *`* * I understood it was on the abstract also that Lobdell-Bailey had bought the timber, and the Fletcher Paper Company had bought the hemlock. I would not say whether Mr. Harpster found them in the abstract, but presume he did, that is where he should take it from. He told me of it. * * * I inquired for the title, the proper owner of the lands, that is what I was looking for. I did not look for tax titles. I was looking for a straight chain of title in a straight deed from Mr. Burton and I supposed we got it. I did not know there was any tax titles on the land. I have never heard anything about tax titles."

Clark was not a purchaser in good faith, as a matter of law. *Messenger* v. *Peter,* 129 Mich. 93. And it is clear, we think, that neither he nor Burton were bona fide purchasers in fact. A reading of their testimony convinces us that it is not worthy of belief. It is quite unnatural that these friends and partners in business should not have discussed Clark's trip to Michigan on his return. It is even more unnatural that a man of Burton's limited means should have put practically all of his property into the purchase of these lands and risked financial ruin, without any knowledge whatever of their character, with no information except the vague statements of a stranger, and apparently without any inquiries.

Burton's deed to Clark furnished no consideration for the quitclaim deed to him. The alleged deed of the house and lot drawn by Burton was a mere nullity, if it ever existed at all, about which there is room for doubt. The inconsistent statements of Burton about this deed, in connection with the unnatural character of the exchange of lands, indicate strongly that the original transaction was a sham and tend to characterize the second deed as of similar character. The real motive or consideration for the deed from Clark to Burton is readily supplied by Clark's knowledge of Chandler's claim of title. The whole transaction was managed so that Burton should run as little risk as possible. The deed was subject to the

mortgage which Clark agreed to pay and it was probably also agreed that the deed should not be put on record but the property should be deeded by Burton when a purchaser was found, as was in fact done. At the time this deed was made, Burton had returned from his trip to Michigan and had undoubtedly discovered the necessity of a warranty deed. The warranty deed of January 29th rests for its consideration upon the original consideration for the quitclaim deed of January 1st. All that Clark received for this warranty deed of valuable timber lands, worth, as the stranger said, from $7 to $10 an acre, and actually worth more, was a piece of paper which he must have known was of no legal force whatever, together with an alleged agreement by Burton to surrender his note and to pay the mortgage which Clark, in the deed of February 21st, expressly agreed to pay. The $200 note, the $182 of taxes, the $68 in cash, and the earnings of the stock in the building and loan association, according to Burton, went to Clark to reimburse him for the lessened value of the house and lot because of the mortgage.

It is clear that this property was not paid for as Clark testifies on January 1, 1902, nor on January 29th. The $182 of taxes were not paid till the following February and the $300 equity in the house and lot was not conveyed to him until February 21st. At the time Burton received his first warranty deed, Clark had received nothing of value from Burton, unless it was the surrender of his $200 note, which depends entirely upon the veracity of Clark and Burton. It is admitted that there was no consideration for the warranty deed of March 8, 1902, except the mortgage upon the lands conveyed by it and the previous deed, and this was not equivalent to payment. 23 Am. & Eng. Enc. Law (2d Ed.), p. 489. We are entirely satisfied that these deeds were made with actual notice on the part of both Burton and Clark of Chandler's claim of title, and that they were without consideration. We are also satisfied that McTiver and the Mahoneys had notice

of Chandler's rights.   It is apparent that they understood
that it was essential that they should not have direct
notice of an unrecorded deed.   Mr. Covey testified:

"They asked me, and I think the question came from
Mr. Mahoney, a question as to which would take preced-
ence, a deed unrecorded or a second deed of the same
property which was first recorded, which would hold.   I
don't think they used the term precedence; they asked
which would hold.   I went on and told them what I un-
derstood to be the law.   *   *   *   But Mr. McTiver did
say, at one time, when I said that if the second purchaser,
the man that took the second deed, took it without notice,
that I thought his title would, perhaps, hold, in preference
to that of the parties who held an unrecorded first deed.
Mr. McTiver did say, ' That is just my case; that is just
my fix,' or some similar expression.   And Mr. Mahoney
broke in with a sort of a disclaimer, ' Well, no, not exactly,
is it ?' or something like that.   And Mr. McTiver said,
' Yes, sir; that is just my fix,' or ' just my case.'   *   *   *
I perhaps didn't make a very accurate statement of the
law, but remember that I undertook to tell them that
there was two kinds of notice, that is, that notice might
be actual or constructive; and that the records would af-
ford constructive notice to a purchaser, you know, and
that if they had actual notice, that that would be just as
destructive, as far as the rights of the second grantee
were concerned, as though they had had constructive
notice; that is, actual notice would take the place of the
record, if they had that actual notice, and I think Mr.
Mahoney said he didn't have it, never had heard anything
about it, but at the same time, there was no reference to
Mr. Chandler, nor no reference to any particular descrip-
tions of land.   That is just about what occurred between
us at the time."

Mr. Chandler resided at Onaway in the same township
in which the greater part of the lands involved is situated.
The Mahoneys also lived at Onaway and Daniel Mahoney
was the foreman or general manager for Gardner, Peter-
man & Company in their mill at Onaway and went over
the lands for them when Chandler made the sale to them
of 20,000,000 feet of elm and basswood.   The Lobdell-
Bailey Manufacturing Company and Gardner, Peterman

& Company had their offices at Onaway. The defendants were careful to avoid any inquiries of these people who might explain the origin of the burnt woolen smell. They were equally careful in not directing their attorneys to make an investigation of the title but confined them to a determination of where the record title was, as shown upon the face of the abstract. Mr. Reilley was requested to and did make the examination by telephone from Cheboygan. Mr. Harpster was not called to Rogers City where the records were, but was called to Onaway and necessarily confined to the abstract itself.

It is impossible to read this record without the conviction forcing itself upon the mind that all of these parties had actual notice that Chandler was claiming under an unrecorded deed, proof of which notice they were endeavoring to avoid. Furthermore, we are satisfied that the evidences of Chandler's possession of these lands were so open and notorious as to constitute notice to intending purchasers.

3. According to the understanding of Clark and Burton, as indicated by their testimony, they were not purchasing the title to these premises from Brown & Farley but were redeeming their own title. This also was the legal effect of the transaction. The purchasers of the State's title acquired a valid title to the lands, subject to a privilege granted by the State to the original owner, his grantees or mortgagees, to obtain a reconveyance. As against every one but those owning interests in the lands, the purchasers from the State acquired an absolute title, which they could dispose of for such price and on such terms as they saw fit. *Griffin* v. *Kennedy*, 148 Mich. 583.

Only such owners could call upon the State's grantee for a reconveyance by paying the sums required by the statute; all others would have to pay such sums as the holder of the title chose to exact. Burton had apparently a valid title of record and was, on the face of the record, vested with the statutory privilege of a reconveyance.

As a matter of fact, his ownership was acquired by fraud and he was not entitled to a reconveyance. The conveyances intended to restore to a former owner the title which he has lost cannot be made the basis of an entirely distinct and new title.

So far as the deeds from the auditor general to Burton are concerned, they do not affect this case, since no proceedings have been taken under them to cut off Chandler's rights.

Decree affirmed, with costs to complainants.

GRANT, C. J., and MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.